UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
AT LEXINGTON

| UNITED STATES OF AMERICA, | CRIMINAL NO. 5:18-62-KKC |
|---|---|
| Plaintiff, | |
| V. | **OPINION AND ORDER** |
| ABDOURAHMAN JABBI, | |
| Defendant. | |

\*\*\* \*\*\* \*\*\*

This matter is before the Court on the defendant Abdourahman Jabbi's motion to suppress evidence seized from his vehicle and to suppress statements made by him to officers after he was arrested (DE 26).

A state trooper stopped Jabbi while he was traveling on I-75. Ultimately, the trooper searched Jabbi's car and discovered marijuana and cocaine. Jabbi argues that the evidence should be suppressed because the trooper "provoked" the traffic violation that led to the stop. Jabbi also argues that the trooper detained him for longer than permitted under the Fourth Amendment and that there is insufficient evidence that Jabbi consented to the search of his vehicle or that he knowingly waived his right to remain silent after being read the warnings required under *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). For the following reasons, the motion to suppress will be denied.

**I. Facts**

At the hearing on this matter, Kentucky State Police Trooper Michael King testified that he has been employed by the Kentucky State Police since 2005 and is currently a member of the Drug Enforcement Special Investigations Unit. He testified that, on May 23,

2018, he and Sergeant Lafe Owens were sitting in a patrol car in a median on I-75 at approximately mile marker 83 when Trooper King observed a white Mercedes SUV driving in the far-right lane much slower than the other vehicles. He testified that he had not observed any traffic violations by the Mercedes driver at that point, but he pulled onto the interstate and proceeded to follow the vehicle.

As he got closer to the Mercedes, however, Trooper King noticed that the vehicle would veer off to the right-hand side of the road and hit the rumble strips. Trooper King observed the driver looking over his left shoulder out the rear passenger window, again veering to the right and hitting the rumble strips, then gaining control of the car, and repeating the same cycle two or three times.

Trooper King stated that he suspected the driver was either under the influence or falling asleep. After following the Mercedes for about two miles, Trooper King turned on his emergency equipment to initiate a stop for careless driving. The Mercedes stopped on the right side of the highway. Trooper King stopped behind the vehicle, got out of his patrol car, and approached the Mercedes from the passenger's side for safety reasons.

Trooper King asked the driver, defendant Jabbi, if he was tired and defendant Jabbi stated he was and that he had been driving for a while. Trooper King testified that Jabbi was extremely nervous, noticeably more nervous than other drivers that King had stopped in the past. Jabbi informed Trooper King that he had a stuttering problem. Jabbi handed his driver's license to Trooper King and Trooper King observed Jabbi's hand shaking. Trooper King testified that he was unable to hear Jabbi because of the traffic and so he asked Jabbi to exit his vehicle.

At that point, Trooper King observed a backpack and multiple air fresheners inside Jabbi's vehicle. Tooper King testified that, in his training and experience, multiple air

2

fresheners in one vehicle is a sign the driver is attempting to conceal the odor of something. Trooper King testified that Jabbi exited the vehicle and walked to where Trooper King was standing at the rear of the patrol car.

Trooper King testified that Jabbi became more nervous after exiting the vehicle. He testified that Jabbi told him that he was traveling from Atlanta to Lexington to look at a truck and then was traveling straight back to Atlanta. But Jabbi was unable to tell Trooper King where the truck was located in Lexington. Trooper King testified that Jabbi began looking away from him instead of looking at the trooper as he had at the beginning of the stop. In addition, Trooper King observed Jabbi's eyes roll back in his head when he attempted to speak.

Trooper King testified that he believed Jabbi was engaged in criminal activity, and so he asked Jabbi if there was anything the trooper should be concerned about. Jabbi said there was not. Trooper King asked Jabbi if he possessed marijuana or cocaine, and Jabbi said he did not. Trooper King testified that he asked Jabbi if he could search the vehicle, and Jabbi said "sure, go ahead" and motioned with his hands toward the vehicle. Trooper King instructed Jabbi to stand with Sergeant Owens. Trooper King and another trooper who had arrived at the scene, David Burton, began searching the vehicle.

The two officers went to the rear of the vehicle and opened the door to the cargo area. Trooper King testified that there were more air fresheners plugged into an electrical outlet in the cargo area. Trooper King lifted a blanket that was in the spare tire area and found multiple vacuum-sealed packages containing suspected marijuana. The packages were ultimately weighed and determined to contain 27 pounds of marijuana.

Trooper King walked back to Jabbi and placed him in handcuffs. At this point, additional officers had arrived at the scene and were searching the car. Trooper Michelle

Lang observed that the carpet had been pulled up underneath the rear passenger seat. She lifted the flaps and found a white garbage bag containing what appeared to be two kilos of cocaine. Officer Burton found approximately $4,300 cash inside the backpack sitting on the back seat.

The officers placed Jabbi in Officer Burton's vehicle and drove him to the Drug Enforcement Administration offices in Lexington. Special Agent Chris Hill of the DEA testified that when Jabbi arrived at the office, he was placed in the processing room, and the DEA officers received background from the arresting officers. Agent Hill testified that he and Task Force Officer Elijah Morris began to interview Jabbi. Agent Hill testified the first thing he did was read Jabbi the warnings required under *Miranda*. Agent Hill testified that Jabbi indicated he wanted to cooperate with the officers. He did not ask for a lawyer and did not ever ask Agent Hill to stop questioning him.

Jabbi told the officers that he was from Gambia and had been directed by a Hispanic male named Alberto from Atlanta to transport drugs to a man named "G" in Cincinnati. Alberto told Jabbi he would be paid approximately $5,000 for doing so. Jabbi told the officers he had been arrested before for transporting a large amount of marijuana. Agent Hill testified that Jabbi gave the officers consent to search his cell phone and provided them the password to access the phone's contents.

Officer Morris found text messages between G and Jabbi in which G stated he needed "groceries" ASAP. Jabbi told the officers that G was sick and needed groceries. The officers believed that Jabbi was not being truthful with them.

Jabbi testified that he is from Gambia and that he was born with a severe speech impediment. He testified that it is difficult for him to begin speaking; that there is a long pause before he can get words out, and that his lips flap, he mumbles, and his eyes react

also. He testified that it is embarrassing to him and he will put his head down or look away when he speaks to someone. When he does begin speaking, he stutters. He testified that his speech problems are more pronounced when he is nervous.

Jabbi testified that he lives in Georgia now. He testified that, on the day he was stopped by Trooper King, he was traveling 70 miles per hour and moving with the flow of traffic. He testified that the patrol car came close to his bumper, which scared Jabbi and so he sped up. He testified that the only time he looked over his left shoulder was when the patrol car came very close to his car and scared him. He testified that he never hit the rumble strip.

Jabbi testified that, after the patrol car stopped him, Trooper King approached the passenger side and told Jabbi he was concerned Jabbi was intoxicated. Jabbi testified that he told Trooper King he had a bad speech problem.

He testified that Trooper King took his driver's license, went back to the patrol car, and then returned to the passenger side of the car and asked Jabbi to step out. Jabbi testified that he went back and stood at the back of the Mercedes, in front of the patrol car. He testified that Trooper King did not ask him to take any sort of sobriety test.

Jabbi testified that the trooper asked him for consent to search the vehicle. Jabbi testified that he tried to ask the officer why he wanted to search the vehicle, but he was having trouble speaking. Jabbi testified that he did not give Trooper King his consent to search the car. Nevertheless, Trooper King began to search the Mercedes. Jabbi testified that Trooper King instructed Jabbi to stand with Sergeant Owens so Jabbi felt like he had to stay there.

Jabbi testified that, at the DEA office, Agent Hill read him "the rights" from a card but he did not understand them. He testified that the officers told him that he a right to a

lawyer, but he did not ask for one. He testified that the officers also told him he had the right to remain silent. He testified that, at some point during the interview, another officer came in and said that officers were trying to find his phone in the car and asked Jabbi for his phone number so the officers could call it. Eventually one of the officers brought the phone into the interview room and asked Jabbi for the password. Jabbi testified that he refused to give the officer the password and so the officer told Jabbi to enter the password into the phone himself, which Jabbi did. Jabbi testified that, if the officers had told him that he did not have to let them search his phone, he would not have permitted them to do so.

## II.  Discussion

The Fourth Amendment protects against unreasonable searches and seizures. *California v. Carney*, 471 U.S. 386, 390 (1985). A traffic stop by officers constitutes a "seizure" for purposes of the Fourth Amendment. *Whren v. United States*, 517 U.S. 806, 810 (1996). "As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." *Whren*, 517 U.S. at 810.

Here, the officers had probable cause to believe that Jabbi was driving under the influence or driving carelessly. Trooper King testified unequivocally that he observed Jabbi's vehicle swerve to the right and hit the rumble strip at least twice. Jabbi argues that the Court should not find Trooper King's testimony credible because he did not follow KSP regulations requiring that he contact dispatch to report that he was stopping a vehicle. Trooper King's failure to contact dispatch is not relevant to his credibility regarding the reason for the traffic stop. Trooper King's testimony was consistent with the police report filed by him on the night of the stop. His testimony is also consistent with the police report

filed by Sergeant Owens. Moreover, Trooper King's testimony did not differ significantly from Jabbi's own testimony on this issue. In his testimony, Jabbi denied hitting the rumble strip, but he never denied that the Mercedes swerved.

Further, Jabbi seems to concede that there was probable cause to arrest him for careless driving, but he argues that Trooper King provoked the violation by coming too close to Jabbi's bumper. (DE 40, Supplemental Mem. at 4.) Jabbi testified that Trooper King's patrol car came close to Jabbi's vehicle, causing Jabbi to look over his left shoulder and speed up. Nevertheless, Jabbi and Trooper King both testified that, at the time, the patrol car was in the middle lane and Jabbi's Mercedes was in the right lane. That should not provoke a driving violation.

Jabbi also argues that, having stopped him for careless driving, Trooper King detained him too long. "Once the purpose of the traffic stop is completed, a motorist cannot be further detained unless something that occurred during the stop caused the officer to have a reasonable and articulable suspicion that criminal activity was afoot." *United States v. Hill*, 195 F.3d 258, 264 (6th Cir. 1999). Trooper King testified that Jabbi was extremely nervous, more nervous than was typical of other individuals he had stopped in his career. Trooper King was able to see multiple air fresheners in the Mercedes which, based on the trooper's training and experience, caused him to believe Jabbi was attempting to cover up the odor of something. Further, Jabbi told the officer a suspicious story regarding why he was traveling. He said that he was traveling from Atlanta to Lexington to look at a truck, but he was unable to state where the truck was located.

Further, as the two spoke, Jabbi began looking away from Trooper King and took several seconds to respond to questions. These reactions may well have been caused by Jabbi's speech impediment but, based on Trooper King's brief interaction with Jabbi on the

7

night of the arrest, they were reasonably concerning. Considering all of the factors known to Trooper King at the time of the stop, he had a reasonable suspicion that Jabbi was engaged in some sort of criminal activity.

Jabbi argues that there is not sufficient evidence that he consented to the search of the Mercedes. Trooper King testified multiple times, however, that Jabbi said, "sure, go ahead" when Trooper King asked if he could search the vehicle. The trooper's police report filed on the date of the events is consistent with his testimony. Likewise, Sergeant Owens' report confirms that Jabbi stated "go ahead" when Trooper King asked if he could search the vehicle. The fact that two officers perceived Jabbi to consent to the search indicates that, even if Jabbi did not intend to consent, an "ordinary" person would have perceived Jabbi to have consented. *United States v. Carter*, 378 F.3d 584, 588 (6th Cir. 2004) ("Any ordinary caller, under like circumstances, would understand assent to have been given, and the police are not held to a higher standard in this regard than an ordinary person.") Even Jabbi conceded that Trooper King may have misunderstood his response as a consent to search. Jabbi also conceded that he never objected to the search after it commenced. Thus, Trooper King had no reason to question whether Jabbi consented once the search began.

Finally, Jabbi argues that the government produced insufficient evidence that he knowingly waived his right against self-incrimination. Jabbi and Agent Hill both testified that Agent Hill read Jabbi the *Miranda* warnings. There is no dispute that Jabbi never asked for counsel but instead cooperated with the police. Jabbi does not explain why this evidence is insufficient proof that that he knowingly waived his right to remain silent. While Jabbi certainly has a speech impediment, there is no indication that he does not speak or understand the English language.

To the extent that Jabbi argues he did not consent to the search of his cell phone, Agent Hill testified that he did. Further, even Jabbi testified that he entered his passcode into his phone so that the officers could review the contents. This would reasonably appear as consent to search the phone's contents. The government need not prove that Jabbi knew he did not have to consent to the search. *See United States v. Erwin,* 155 F.3d 818, 823 (6th Cir.1998).

**III. Conclusion**

For the all these reasons, the Court **HEREBY ORDERS** that Jabbi's motion to suppress (DE 26) is **DENIED**

Dated October 26, 2018.

KAREN K. CALDWELL, CHIEF JUDGE
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY